**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **STEVEN BOEH,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Action No. EA-23-1020** |
| **AARON DAIL,** *et al.*, | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

Plaintiff Steven Boeh initiated the above-captioned action on April 17, 2023, asserting federal civil rights and state law tort claims against Baltimore Police Department Officers Aaron Dail, Scott Gephardt, and Aigbo Abaku in their individual and official capacities.  ECF No. 1.  Mr. Boeh alleges Officers Dail, Gephardt, and Abaku unlawfully entered his residence, detained him without legal justification, used excessive force, and acted maliciously in bringing criminal charges against him.  ECF No. 16 ¶ 3.  Pending before the Court are Mr. Boeh's motion for partial summary judgment (ECF No. 45) and Defendants' cross-motion for partial summary judgment (ECF No. 52), each of which is fully briefed (ECF Nos. 58, 63).  No hearing is necessary.  Local Rule 105.6 (D. Md. 2025).  For the reasons set forth below, both motions are granted in part and denied in part.

## I.    BACKGROUND

Mr. Boeh's First Amended Complaint asserts six counts against Defendants: trespass (Count One); battery (Count Two); false imprisonment (Count Three); malicious prosecution against Officer Abaku only (Count Four); violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 (Count Five); and violations of Articles 24 and 26 of the Maryland Declaration of Rights (Count Six).  ECF No. 16 ¶¶ 73–110.

A.    **Undisputed Material Facts**[1]

1.    Overview of the Incident

Scott Gephardt, Aaron Dail, and Aigbo Abaku were police officers with the Baltimore Police Department at the time of their encounter with Mr. Boeh.  Mr. Boeh owned a multi-unit residential property located at 2905 East Strathmore Avenue in Baltimore, Maryland.  ECF Nos. 45-1 at 7; 52-1 at 3.[2]  Mr. Boeh's property was subdivided into separate upper and lower units, with the upper unit accessible only via a wooden staircase attached to the right exterior side of the house.  ECF Nos. 45-1 at 8–9; 52-1 at 3.  The exterior staircase ascended to a narrow wooden landing enclosed by a wooden railing.  ECF Nos. 45-19 at 2, 4; 52-3 at 2; *see* Images 1 and 2, *infra*.  Cassie Bailey lived in the lower-level apartment.  ECF Nos. 45-1 at 3–4; 52-1 at 7.

On March 30, 2021, at 10:01 p.m., Ms. Bailey contacted 911 and reported that her landlord (Mr. Boeh) was on the property in violation of a peace order.  ECF Nos. 45-2 at 2; 52-6 at 2.  Officer Gephardt testified at his deposition that he responded to a call for service at 2905 East Strathmore Avenue on March 30, 2021.  ECF No. 45-3 at 55:14–17.  Officer Gephardt first spoke with Ms. Bailey, who told him that she had heard "noises upstairs" and believed that it may have been "Steven Boeh and his daughter."  *Id.* at 62:3–5, 13–17.  Ms. Bailey did not say that she had seen Mr. Boeh or had "any encounter with him."  *Id.* at 62:18–63:2.

Officer Gephardt further testified that he then went upstairs and knocked on Mr. Boeh's front door, but there was no response.  *Id.* at 72:18–19, 75:10–11, 78:19–79:1.  Officer Gephardt "tried the doorknob" and the "door was unlocked."  *Id.* at 75:16–17.  Officer Gephardt "used [his] hand to turn the knob and open the door to the residence" but "did not gain entry."  *Id.* at

---

[1]  As neither party seeks summary judgment on the malicious prosecution claim, those allegations are not addressed in this Memorandum Opinion.

[2]  Due to the volume of exhibits filed in connection with the pending motions, the Court incorporates by reference the record citations contained in the cited memoranda of law.

79:5–9.  At this time, Officer Gephardt did not have a basis to compel Mr. Boeh to speak with him or probable cause for a warrantless arrest.  ECF No. 45-3 at 82:5–9, 16–19; ECF No. 45-10 (Request No. 12); ECF No. 45-12 (Request No. 13).  Mr. Boeh attempted to close the front door.  ECF Nos. 45-3 at 90:17–19; 45-16 at 191:2–12.  Mr. Boeh was unable to do so because Officer Gephardt's leg was in between the door and the doorjamb.  ECF No. 45-3 at 90:21–91:4; ECF No. 45-17 at 37:14–21.  Officer Gephardt entered Mr. Boeh's residence, and a physical confrontation ensued.  ECF Nos. 45-1 at 11–17; 45-10 (Request Nos. 15–16); 52-1 at 10–12.  The confrontation carried over to the landing outside.  ECF No. 45-7 at 71:13–17.  Once on the landing, Officer Dail grabbed Mr. Boeh's left arm and Officer Gephardt sprayed Mr. Boeh with Oleoresin Capsicum spray.  ECF Nos. 45-3 at 104:8–105:9; 45-7 at 72:4–7; 45-10 (Request No. 24).  Eventually, Mr. Boeh went over the railing and landed on the back roof.  ECF No. 45-16 at 251:1–253:16; *see* Image 3, *infra*.  Mr. Boeh fled the scene and later turned himself in to authorities.  ECF Nos. 45-9 at 104:3–9; 52-1 at 11–13.  Mr. Boeh sought medical treatment on March 31, 2021, and was diagnosed with multiple fractures.  ECF No. 45-20.

On the evening of March 30, 2021, Officers Gephardt and Dail did not know of an arrest warrant for Mr. Boeh, nor did they know of a warrant authorizing entry into Mr. Boeh's residence at 2905 East Strathmore Avenue.  ECF Nos. 45-10 (Requests Nos. 8–9); 45-12 (Requests Nos. 9–10).  Neither Officer Gephardt nor Officer Dail had personal knowledge of a court order of any kind that precluded Mr. Boeh from being present in the upper-level apartment, nor did Ms. Bailey produce any documentation or a court order that indicated Mr. Boeh was not permitted to be present on the property.  ECF Nos. 45-10 (Requests Nos. 4–6); 45-12 (Requests Nos. 4, 7–8).  The officers were not in "hot pursuit" of Mr. Boeh and did not utilize their police radio or computer to determine if there was, in fact, a peace order in place concerning Ms. Bailey.  ECF No. 45-7 at 37:16–18, 48:9–13, 54:18–55:1.

2.    Images of the Areas Surrounding the Upper-Level Apartment



Image 1: Landing outside of the upper-level apartment
(Still image from Officer Gephardt's body-worn camera video; Plaintiff's Exhibit4; Defendants Exhibit 8)



Image 2: Landing outside the front door of the upper-level apartment
(ECF No. 45-19 at 4) (cropped)



Image 3: Flat roof behind the railing
(ECF No. 58-9)



Image 4: Rear of 2905 East Strathmore Avenue
(ECF No. 52-5) (cropped)

> 3.    Relevant Images

The parties submitted videos of the encounter between Mr. Boeh and Officers Gephardt,

Dail, and Abaku.  ECF Nos. 51, 56.  Mr. Boeh submitted Officer Gephardt's body-worn camera

(BWC) video (Plaintiff's Exhibit 4), Officer Dail's BWC video (Plaintiff's Exhibit 7), and a

video captured on a cellular telephone (Plaintiff's Exhibit 17).[3]  Defendants submitted Officer

---

[3]  Mr. Boeh identified Plaintiff's Exhibit 17 as "Dales Cell Phone Recording" in his
motion.  ECF No. 45-1 at 2.  Prior filings, however, identify Plaintiff's Exhibit 17 as "a cell

Dail's BWC video (Defendants' Exhibit 1), Officer Gephardt's BWC video (Defendants' Exhibit 8), and Officer Abaku's BWC video (Defendants' Exhibit 11).[4]  Neither party disputes the authenticity or accuracy of the submitted videos.[5]  They do, however, dispute the events in the videos and the inferences that may be drawn from them.  The Court summarizes the videos' depictions (but not any inferences drawn therefrom) as undisputed.

       1.   <u>BWC Video</u>

At 10:13 p.m. on March 30, 2021, Officers Gephardt and Dail arrived on the scene and spoke to Ms. Bailey, who stated that her landlord, Mr. Boeh, was in the second-floor apartment in violation of a peace order.  ECF Nos. 45-2 at 2; 52-6 at 2; Gephardt BWC at 0:43.  Ms. Bailey further explained that her landlord had "assaulted [her] last week," was out of jail on pretrial release, and was "not supposed to be on this property or anywhere near [her]."  Gephardt BWC at 0:43–0:54; ECF No. 45-15 at 2:5, 8–9.  Ms. Bailey told Officer Gephardt that he would have to use the exterior staircase to access the second-level unit.  Gephardt BWC at 1:25; ECF No. 45-15 at 2:24–3:2.  Officer Gephardt approached the staircase, turned on his flashlight, and ascended the stairs with Officer Dail following behind him.  Gephardt BWC at 1:43; Dail BWC at 1:37.  At the top of the staircase was a narrow balcony with a ladder, what appeared to be PVC pipes, and other materials at the far-end of the balcony.  Gephardt BWC at 1:57; ECF No. 45-19 at 2.

_____

phone recording by Casie [*sic*] Bailey." ECF Nos. 48, 51.  Review of Plaintiff's Exhibit 17 appears to show a cell phone recording by Ms. Bailey.

   [4]  To avoid duplicative citations to the record, citations to Officer Gephardt, Officer Abaku, and Officer Dail's body-worn camera (BWC) videos are "Gephardt BWC," "Abaku BWC," and "Dail BWC," respectively.

   [5]  A "relevant video 'whose accuracy is unchallenged'" should be considered at summary judgment.  *Sawyer* v. *Asbury*, 537 Fed. Appx. 283, 291 (4th Cir. 2013) (quoting *Zellner* v. *Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007)).

Officer Gephardt peered into the apartment through a narrow window in the front door, shining his flashlight into the interior.  Gephardt BWC at 1:59.  A light was on inside the apartment, but no one was visible inside.  *Id.*  Officer Dail stood several feet away from the front door, closer to the top of the stairs.  *Id.* at 2:18.  Officers Gephardt and Dail then discussed whether they could check if there was a peace or pretrial release order against Mr. Boeh:

| | |
|---|---|
| Officer Dail: | So, we have no way of checking . . . |
| Officer Gephardt: | Right. |
| Officer Dail: | . . . a pretrial protection order though. |
| Officer Gephardt: | If he was served, he ain't supposed to be here. |
| Officer Dail: | But that's what I'm saying. But if it's pretrial release there's no . . . we don't serve that.  I don't know how you check it. |
| Officer Gephardt: | Well, we can just run his name and see if he's got an active one. |
| Officer Dail: | Well, that's what I'm saying.  I don't think they show up that way. |
| Officer Gephardt: | Uh-huh.  Alright. |

*Id.* at 2:04-2:39; Dail BWC at 2:08-2:36; ECF No. 45-6 at 3:10–22.

Officer Gephardt knocked on the apartment door.  Gephardt BWC at 2:40; Dail BWC at 2:36.  Gephardt sighed, and said, "I smell a bunch of marijuana" to which Officer Dail asked, "Do you?"  Gephardt BWC at 2:50; Dail BWC at 2:45; ECF No. 45-6 at 3:22–24.  Officer Gephardt did not respond.  Gephardt BWC at 2:57; Dail BWC at 2:52; ECF No. 45-6 at 3:24–25.  Officer Gephardt again knocked on the door and looked inside the apartment through the narrow window in the front door.  Gephardt BWC at 3:16.  Officer Gephardt did not identify himself as a police officer or ask Mr. Boeh to open the door.  *Id*.  The apartment lights turned off and Officer Gephardt scoffed and said, "He just turned the light out."  *Id.* at 3:21; Dail BWC at 3:20.  Officer Gephardt placed his right hand on the doorknob.  Dail BWC 3:27.  Officer Dail turned

away from Officer Gephardt and motioned for someone at the bottom of the staircase to come

upstairs.  Gephardt BWC at 3:39; Dail BWC at 3:33.

Officer Gephardt stated, "It's open."  Gephardt BWC at 3:39; ECF No. 45-6 at 4:3.  The

door swung open and audibly collided with the wall.  Gephardt BWC at 3:40.  The inside of the

apartment was dark, and Mr. Boeh can barely be seen on the video, but can be heard saying,

"No."  Gephardt BWC at 3:43; ECF No. 45-6 at 4:4.  Officer Gephardt motioned for Mr. Boeh to

come toward him, stating, "Come here, bud," and Mr. Boeh approached the open front door.

Gephardt BWC at 3:44; ECF No. 45-6 at 4:5.  Mr. Boeh said, "Look, this is my house, dude."

Gephardt BWC at 3:44; ECF No. 45-6 at 4:6.  While the video is dark, Mr. Boeh's silhouette can

be seen walking to the front door and placing his left hand on the door of the apartment.

Gephardt BWC at 3:41–3:43.  Mr. Boeh appeared to attempt to close the door.  *Id.* at 3:44.

Officer Gephardt was outside of the door frame standing on the balcony.  *Id.* at 3:45.  The door

was pushed closed but collided with something out of the video's frame and appeared to be

unable close fully.  *Id.* at 3:45.  Officer Gephardt did not say anything to Mr. Boeh.  *Id.*  Officer

Gephardt entered the residence, and a scuffle ensued.  Dail BWC 3:42.  Mr. Boeh stated, "I'm

allowed here, dude!  This is my house, dude.  Please, guys."  Gephardt BWC at 3:49; ECF No.

45-6 at 4:6–8.  Officer Gephardt was inside Mr. Boeh's apartment at this time and Officer Dail

can be seen entering through the doorframe of the apartment behind Officer Gephardt.  Gephardt

BWC at 3:50; Dail BWC at 3:44.  Officer Gephardt emerged from the apartment onto the

balcony with Mr. Boeh in front of him.  Gephardt BWC at 3:53.

Mr. Boeh was pushed against the wooden railing, which was about the height of his

waist, and his torso leaned over the railing.  Gephardt BWC at 3:56; Dail BWC at 3:54.  Officer

Dail twice stated, "Stop resisting," to which Mr. Boeh said, "Dude, I'm going to fall off the

[expletive] rail."  Gephardt BWC at 4:08; ECF No. 45-6 at 4:11–14.  The video does not show

how Officer Dail was holding Mr. Boeh.  Gephardt BWC at 4:08.  An officer had Mr. Boeh's right hand, released it, and stated, "Stop!  Stop or you're getting maced right now!"  *Id.* at 4:11; ECF No. 45-6 at 4:15–16.  Mr. Boeh was standing in front of Officer Dail with his right hand on the railing, facing away from Officer Dail.  Gephardt BWC at 4:12.  An officer continued to yell "Stop," and Mr. Boeh said, "Okay, okay," while Officer Dail dragged Mr. Boeh toward the staircase and Officer Gephardt.  *Id.* at 4:14.  Mr. Boeh stated, "I'm falling.  You're pushing me.  You are pushing on me, dude" and Officer Dail said, "Stop moving your legs, stop moving." Gephardt BWC at 4:17; ECF No. 45-6 at 4:17–25.  Officer Gephardt held a red cannister in his right hand as Officer Dail yelled, "Mace!  Hit him, hit him, hit him, hit him, hit him."  Gephardt BWC at 4:25; ECF No. 45-6 at 5:1–2.  Officer Gephardt appeared to lean over Officer Dail. Gephardt BWC at 4:27.  Officer Dail released Mr. Boeh and Officer Gephardt said, "He's going to jump!  He's going to jump off! . . . Go, go, go, go, go with him!"  *Id.* at 4:33; ECF No. 45-6 at 5:2–3.  Mr. Boeh then sat on the wooden railing at the far end of the balcony with his legs on top of the railing and his back against the house.  Gephardt BWC at 4:33.  Officer Gephardt turned towards the staircase and ran past the open door to the house.  *Id.* at 4:36.  Officer Dail was ahead of Gephardt and as both officers descended the staircase, Officer Gephardt stated, "Go, Abaku!"  *Id.* at 4:44.

Officer Abaku arrived on the scene at 10:16 p.m.  Abaku BWC at 00:26.  Officer Abaku encountered Ms. Bailey and proceeded to the right side of the house to base of the wooden staircase.  *Id.* at 1:01.  Flashlights can be seen at the top of the landing, but the video does not reveal who is at the top of the staircase.  *Id.* at 1:10.  Officer Abaku ascended the staircase and encountered Mr. Boeh, Officer Dail, and Officer Gephardt struggling on the balcony.  *Id.* at 1:24. Officers Gephardt and Dail pushed Mr. Boeh up against the railing while Officer Abaku assisted, saying, "Careful, he's about to fall off."  *Id.* at 1:33.  Mr. Boeh fell over onto the balcony in front

9

of Officer Dail, who as in front of Officer Gephardt, who was in front of Officer Abaku.  *Id.* at 1:42.  Officer Gephardt yelled, "He's going to jump!" and Officer Abaku rapidly descended the staircase and ran to the back of the house.  *Id.* at 2:19; ECF No. 45-6 at 5:2–3.

The remainder of Officer Gephardt's body-worn camera video shows him searching for Mr. Boeh, interacting with other officers, and discussing what occurred during the confrontation with Mr. Boeh.  Gephardt BWC at 4:44–40:15.  Officer Dail's body-worn camera came off during the altercation with Mr. Boeh and was later retrieved by Officer Gephardt from the balcony outside the upper-level apartment.  Gephardt BWC at 35:42; Dail BWC at 4:40–35:30; ECF No. 45-6 at 5:11.  The remainder of Officer Abaku's body-worn camera video also shows him searching for Mr. Boeh and interacting with other officers.  Abaku BWC 2:20-37:06.

2.    <u>Ms. Bailey's Cellular Telephone Video</u>

Ms. Bailey's cellular telephone video began recording when Officer Abaku arrived on the scene and therefore sheds no light on the events inside the second-floor apartment.  Bailey Video at 0:04; Abaku BWC at 0:50.  In relevant part, the video shows Officer Abaku rapidly ascending the wooden staircase and assisting Officers Gephardt and Dail in a struggle with Mr. Boeh.  Bailey Video at 0:33.  Ms. Bailey walked to the right of the house past the staircase and pointed the camera up towards the balcony where officers behind Mr. Boeh are leaning him over the wooden railing before moving him behind the railing and out of view.  *Id.* at 0:38.  A few moments later, Ms. Bailey ran around to the other side of the house, where she yelled, "Look! There he is right there!"  *Id.* at 1:25.

**B.    Disputed Material Facts**

The parties offer differing accounts of the encounter and of the unclear depictions in the videos and the inferences to be drawn therefrom.  ECF Nos. 45-1 at 7–17; 52-1 at 8–12.  The primary difference is the interaction between Mr. Boeh and Officer Gephardt upon the opening

10

of the front door.  Due to the poor lighting and rapid succession of events, the body-worn camera videos shed little light on the precise sequence of events during the approximately one minute between Officer Gephardt opening the front door and Mr. Boeh fleeing the scene.

Mr. Boeh contends that Officer Gephardt knocked twice on the apartment door, received no response, and "nevertheless turned the door handle, discovered 'it [was] open' and [e]ffected a 'warrantless entry' into the second-floor apartment 'without an invitation from the occupants.'" ECF No. 45-1 at 10.  Mr. Boeh "attempted to close the apartment door without making direct personal contact with [Officer] Gephardt" and then Officer Gephardt "forced [his] way into the premises." *Id.* at 11.

Officer Gephardt argues that after no one responded to him knocking on the door multiple times and someone turned the interior lights off, he opened the apartment door, which was unlocked, and the following occurred:

> Officer Gephardt saw Plaintiff . . . and gestured for him to come outside.  Plaintiff walked quickly toward the door and shouted "No!"  As Plaintiff continued to approach, Officer Gephardt stated[,] "[C]ome here, bud," and held open the door with his right hand.  Officer Gephardt perceived Plaintiff's advance toward the door as aggressive.  Based on this perception, while leaving his right hand on the surface of the open door, Officer Gephardt put his leg into the threshold to close the distance between Plaintiff and himself and to prevent Plaintiff pushing Officer Gephardt off the narrow landing.  Plaintiff attempted to quickly shut the door on Officer Gephardt, while Officer Gephardt's body was still in the threshold.  Officer Gephardt then pushed the door open in an attempt to take Plaintiff into custody and a struggle in the doorway ensued.

ECF No. 52-1 at 9–10 (internal record citations omitted).  Officer Gephardt testified at his deposition that Mr. Boeh "ran at [him]" and stated he "went to [Mr. Boeh] so that we did not end up falling off the balcony."  ECF No 52-10 at 95:5–6.  In the body-worn camera video, Officer Gephardt made conflicting statements as to what transpired after he opened the front door.  Officer Gephardt first told Officer Abaku, "So when I tried the door, he comes up and tries

to like push it shut real quick. That's where the fight started." ECF No. 45-6 at 6:4–6. Officer Gephardt told another officer that he tried the "doorhandle," the door was open, and as he was "trying the door handle, [Mr. Boeh] comes up and tried to throw the door shut." ECF No. 45-15 at 8:8–10. Later on, Officers Gephardt and Dail explained to another officer that when the front door opened, they "grab[bed]" Mr. Boeh, they "push[ed] in" to "[g]rab him." *Id.* at 8:13–15.

Officer Dail testified that he observed Mr. Boeh commit the crime of "assault of fighting police." ECF No. 45-7 at 82:11–19. Officer Dail testified that Mr. Boeh kicked him in the chest during the physical confrontation. *Id.* at 83:20–84:17, 85:10–14. Officer Dail further stated that when they were on the landing and tried to grab Mr. Boeh's arm, Mr. Boeh "mule kicked" him in the chest and leapt off the balcony. ECF No. 45-15 at 8:19–20. Officer Dail also said on the body-worn camera video, "My left quad is killing me[,] and I don't know why. I don't know if I got kick[ed] in it." *Id.* at 29:12–13. At a different point in time, Officer Gephardt asked Officer Dail if Mr. Boeh had kicked him and Officer Dail replied in the affirmative. ECF No. 45-15 at 7:13–15.

## II.   DISCUSSION

Mr. Boeh seeks summary judgment on the trespass claim against Officers Gephardt and Dail and on the battery, false imprisonment, Fourth and Fourteenth Amendment, and Article 24 and 26 claims against all three Defendants. ECF No. 45 at 1. Defendants seek partial summary judgment on the trespass claim against Officer Abaku and on the battery, false imprisonment, Fourth and Fourteenth Amendment, and Article 24 and 26 claims against all three Defendants.

### A.   Standard of Review

Summary judgment motion practice "is properly regarded . . . as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986) (quoting

Fed. R. Civ. P. 1).  Federal Rule of Civil Procedure 56 provides that the district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Id.* at 248.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Thus, to defeat summary judgment, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat. Bank of Ariz.* v. *Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968).  On the other hand, summary judgment "is justified if, from the totality of the evidence presented, including pleadings, depositions, answers to interrogatories, and affidavits, the court is satisfied that there is no genuine factual issue for trial and the moving party is entitled to judgment as a matter of law."  *Sylvia Dev. Corp.* v. *Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995).

The Fourth Circuit Court of Appeals has cautioned that summary judgment "cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits."  *Jacobs* v. *North Carolina Admin. Off. of the Cts.*, 780 F.3d 562, 568–569 (4th Cir. 2015) (quoting 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER ET AL., FEDERAL PRACTICE AND PROCEDURE § 2728 (3d ed. 1998)).  At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249.  In doing so, the district court "must view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor without weighing the evidence or assessing the witnesses' credibility." *Baynard* v. *Malone*, 268 F.3d 228, 234–235 (4th Cir. 2001).

When cross-motions for summary judgment are before it, the Court will "examine[] each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Aleman* v. *City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 1032 (2024) (quoting *Fusaro* v. *Howard*, 19 F.4th 357, 366 (4th Cir. 2021) (internal quotation marks omitted)).  Applying that standard, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party.  *Id.* at 283–284 (citing *Henry* v. *Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)).  Therefore, the Court "'may not credit [the movant's contrary] evidence, weigh the evidence, or resolve factual disputes in the [movant's] favor,'" even if "'a jury could well believe the evidence forecast by the [movant]."'"  *Id.* at 284 (quoting *Hensley ex rel. North Carolina* v. *Price*, 876 F.3d 573, 579 (4th Cir. 2017)).

"[W]hen a district court considers a video recording of a police encounter at the summary judgment stage, a court must credit the plaintiff's version of the facts to the extent they are not 'blatantly contradicted' by the recording." *Doriety for Est. of Crenshaw* v. *Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) (quoting *Iko* v. *Shreve*, 535 F.3d 225, 230 (4th Cir. 2008)); *see also Scott* v. *Harris*, 550 U.S. 372, 378, 380-381 (2007) (discussing treatment of video evidence at summary judgment).  The "blatantly contradicted" standard is "very difficult" to satisfy and "requires that the plaintiff's version of events be 'utterly discredited' by the video recording." *Doriety for Est. of Crenshaw*, 109 F.4th at 679 (quoting *Lewis* v. *Caraballo*, 98 F.4th 521, 529 (4th Cir. 2024)).  The Fourth Circuit has explained that the standard for evaluating video

evidence on summary judgment the United States Supreme Court announced in *Scott* "does not

upend the traditional summary judgment analysis." *Simmons* v. *Whitaker*, 106 F.4th 379, 385

(4th Cir. 2024). "Instead, it simply reinforces the unremarkable principle that at the summary

judgment stage, facts must be viewed in the light most favorable to the nonmoving party when

there is a genuine dispute as to those facts." *Id.* (internal quotation marks and citation omitted).

### B.    42 U.S.C. § 1983 (Count Five)

The Court begins its analysis of the cross-motions with the Fourth and Fourteenth

Amendment violations Mr. Boeh asserts via 42 U.S.C. § 1983 because resolution of Mr. Boeh's

state law claims turns on the Court's analysis of the federal constitutional claims. First, the

federal constitution claims control the disposition of Mr. Boeh's Articles 24 and 26 claims

because they are the state analogues to the Fourteenth and Fourth Amendments, respectively.

*E.g.*, *Dent* v. *Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010); *Randall*

v. *Peaco*, 175 Md. App. 320, 330 (2007). Second, the common law torts of trespass, battery, and

false imprisonment "rise and fall" with federal constitutional claims. *Neal* v. *Caplan*, Civil

Action No. BAH-22-1919, 2025 WL 608191, at *12 (D. Md. Feb. 25, 2025) (internal quotation

marks, alteration, and citation omitted) (collecting cases); *accord Estate of Green* v. *City of

Annapolis*, Civil Action No. MJM-24-1351, 2025 WL 1029555, at *21 (D. Md. Apr. 7, 2025)

(battery); *Brooks* v. *McKimmie*, Civil Action No. DLB-23-0208, 2025 WL 1018882, at *5 (D.

Md. Apr. 4, 2025) (false imprisonment).

Section 1983 "is not itself a source of substantive rights, but merely provides a method

for vindicating federal rights elsewhere conferred." *Albright* v. *Oliver*, 510 U.S. 266, 271 (1994)

(internal quotation marks omitted). Section 1983 imposes liability on a person who deprives any

other person of any right, privilege, or immunity secured by the Constitution and laws while

acting under color of law "of any State or Territory or the District of Columbia." 42 U.S.C.

15

§ 1983. Thus, to "state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West* v. *Atkins*, 487 U.S. 42, 48 (1988).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, Sec. 1. As relevant here, the Fourteenth Amendment Due Process Clause "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *City of Revere* v. *Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

### 1.    Fourteenth Amendment Claims

Defendants correctly argue that they are entitled to summary judgment on Mr. Boeh's Fourteenth Amendment claims because his unlawful search and seizure "claims arise, if at all, under the Fourth Amendment, not the Fourteenth Amendment." ECF No. 52-1 at 15. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright*, 510 U.S. at 273 (quoting *Graham* v. *Connor*, 490 U.S. 386, 395 (1989)). Applying this principle, the Supreme Court has held that claims regarding an arrest without probable cause and the use of excessive force during the course of an arrest arise under the Fourth Amendment and not the Fourteenth Amendment's more general substantive due process right. *Id.* at 274–275; *Graham*,

490 U.S. at 395.  Mr. Boeh's unreasonable search, seizure, and use of force claims are therefore

not cognizable under the Fourteenth Amendment.

Defendants further contend that they cannot be liable for failure to render medical

assistance because Mr. Boeh was not in custody when he sustained his injuries, and they did not

know that he needed medical treatment because he had eluded arrest.  ECF No. 52-1 at 15–17.

Mr. Boeh does not address this argument in his opposition to Defendants' motion (ECF No. 58),

which indicates that he has abandoned this aspect of his Section 1983 claim, *e.g.*, *Maryland Elec.*

*Indus. Health Fund* v. *MESCO, Inc.*, Civil Action No. ELH-12-505, 2014 WL 853237, at *7 (D.

Md. Feb. 28, 2014) (collecting cases).  It is undisputed that Mr. Boeh was not in police custody

when he sustained the fractures.  As the Supreme Court has explained, "it is not the deliberate

indifference alone that is the 'deprivation.'  Rather, it is that combined with 'the State's

affirmative act of restraining the individual's freedom to act on [their] own behalf.'"  *County of*

*Sacramento* v. *Lewis*, 523 U.S. 833, 863 (1998) (Scalia, J., concurring) (quoting *DeShaney* v.

*Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 200 (1989)); *see also Pinder* v. *Johnson*,

54 F.3d 1169, 1175 (4th Cir. 1995) ("This Court has consistently read *DeShaney* to require a

custodial context before any affirmative duty can arise under the Due Process Clause.").

Moreover, Defendants could not have been deliberately indifferent to Mr. Boeh's need for

medical attention because they did not know he had been injured and therefore did not

"intentionally, knowingly, or recklessly . . . fail[ ] to act to appropriately address the risk that the

condition posed."  *Short* v. *Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct.

2631 (2024) (outlining the elements of a claim for deliberate indifference to a medical need).

Even if the officers should have known of Mr. Boeh's injuries based on the height from which he

fell or jumped, Mr. Boeh successfully evaded the police and thus the officers could not have

provided him with any medical treatment.  For all of these reasons, summary judgment will be granted in favor of Defendants on Mr. Boeh's Fourteenth Amendment claims.

2.     Fourth Amendment Claims

Mr. Boeh contends that Defendants violated the Fourth Amendment when they entered his residence, seized his person, and used force against him.  In resolving this claim, the Court considers two separate entries: (1) opening the front door and (2) the subsequent entry into the upper-level apartment.  Each category of the alleged unreasonable search and seizure is addressed in turn below.

a)     Warrantless Entry/Unreasonable Search[6]

"Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment."  *Payton* v. *New York*, 445 U.S. 573, 587 (1980) (internal quotation marks and citation omitted).  "[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Id.* at 590.  Thus, "any physical invasion of the structure of the home, by even a fraction of an inch, [i]s too much."  *Kyllo* v. *United States*, 533 U.S. 27, 37, (2001) (internal quotation marks and citation omitted); *see also Johnson* v. *United States*, 333 U.S. 10, 14 (1948) ("The right of officers to thrust themselves into a home is [ ] a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.").

---

[6]  The parties characterize the initial alleged Fourth Amendment violation differently. Mr. Boeh labels it a warrantless entry and Defendants label it an allegedly unreasonable search. *Compare* ECF No. 45-1 at 21 *with* ECF No. 52-1 at 35.  These differing characterizations do not alter the Court's analysis.  *See Florida* v. *Jardines*, 569 U.S. 1, 5 (2013) ("When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search' within the original meaning of the Fourth Amendment has 'undoubtedly occurred.'") (quoting *United States* v. *Jones*, 565 U.S. 400, 406 n.3 (2012)).

The Supreme Court has recognized that a visitor knocking on a front door traditionally has an invitation "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Florida* v. *Jardines*, 569 U.S. 1, 8 (2013). When police officers approach a home without a warrant and knock on the front door, "they do no more than any private citizen might do." *Kentucky* v. *King*, 563 U.S. 452, 469 (2011). "[T]he occupant has no obligation to open the door or to speak." *Id.* at 469–470. Such an encounter is referred to as a "knock and talk," the purpose of which "is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search." *United States* v. *Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007); *accord United States* v. *McNeil*, 126 F.4th 935, 943 (4th Cir. 2025); *Covey* v. *Assessor of Ohio Cnty.*, 777 F.3d 186, 192–193 (4th Cir. 2015). "The purpose of a 'knock and talk' is not to create a show of force, nor to make demands on occupants, nor to raid a residence." *Gomez-Moreno*, 479 F.3d at 355. Thus, "the Fourth Amendment is implicated when officers gain visual or physical access to a room after an occupant opens the door not voluntarily, but in response to a demand under color of authority." *Savage* v. *Sturdivant*, 488 Fed. Appx. 766, 768 (4th Cir. 2012) (internal quotation marks and citation omitted). As the Supreme Court explained over 75 years ago, "[a]n officer gaining access to private living quarters under color of [the] office and of the law which [the officer] personifies must then have some valid basis in law for the intrusion." *Johnson*, 333 U.S. at 17. "Any other rule would . . . obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." *Id.*

Here, the undisputed material facts establish that Officer Gephardt knocked on the door to Mr. Boeh's apartment and after there was no response, Officer Gephardt opened the unlocked door. That act violated the Fourth Amendment. *Kyllo*, 533 U.S. at 37 ("[T]here is certainly no

exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes.") (emphasis in original). Equally clear is that Officer Abaku did not open the door or enter the upper-level apartment. Summary judgment is therefore granted in favor of Mr. Boeh and in favor of Officer Abaku on Mr. Boeh's warrantless entry/unlawful search Section 1983 claim.[7]

As set forth previously, *see* I.B., *supra*, disputed issues of material fact regarding the basis for Officers Gephardt and Dail's subsequent entry into the apartment preclude summary judgment on this aspect of Mr. Boeh's Section 1983 claim. Indeed, is not even clear that Officer Dail entered the apartment. As this Court has repeatedly held, "conflicting accounts of what happened . . . present[ ] a credibility determination for the jury." *Machie* v. *Manger*, Civil Action No. AW-09-2196, 2013 WL 3353740, at *9 (D. Md. July 2, 2013), *aff'd sub nom.*, 564 Fed. Appx. 17 (4th Cir. 2014); *see also Vathekan* v. *Prince George's Cnty.*, 154 F.3d 173, 179–180 (4th Cir. 1998) ("When resolution of a case depends on determining what actually happened, the issue is inappropriate for resolution by summary judgment.") (internal quotations omitted).

---

[7]  Defendants assert a qualified immunity defense with respect to the unlawful arrest and excessive force components of Mr. Boeh's Fourth Amendment Section 1983 claim. ECF No. 52-1 at 22 ("Defendants are . . . entitled to qualified immunity as to the unlawful arrest claim in Count V.") and 28 ("Officer Gephardt is entitled to qualified immunity because Plaintiff cannot demonstrate that pepper spraying a person actively physically [resisting] arrest violates a clearly established right."). *See* II.B.2.b, *infra* (discussing qualified immunity generally). It is unclear whether Defendants advance this same defense with respect to Mr. Boeh's unlawful entry/search claim. Regardless, this Court has previously found that a warrantless entry into a home without an exception to the warrant requirement violates clearly established law. *Allotey* v. *Baltimore Cnty., Md.*, Civil Action No. JMC-21-2288, 2022 WL 17105120, at *7 (D. Md. Nov. 22, 2022); *Lineberger* v. *Yang*, No. 5:14-CV-00137-RLVDCK, 2016 WL 5928816, at *4 (W.D.N.C. Oct. 11, 2016); *see also Covey* v. *Assessor of Ohio Cnty.*, 777 F.3d 186, 196 (4th Cir. 2015) ("[T]he Supreme Court has held that no reasonable officer can 'claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional.'") (quoting *Groh* v. *Ramirez*, 540 U.S. 551, 564 (2004)). Qualified immunity therefore does not shield Officer Gephardt from liability.

The availability of video evidence does not alter this analysis because "the poor quality of the video d[oes] not resolve these disputes." *Witt* v. *West Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011). Indeed, the Fourth Circuit has cautioned that when "video footage . . . is subject to different interpretations[,] neither the district court nor this Court is permitted to decide at the summary judgment stage of these proceedings what the video footage shows or what it did not capture." *Aleman*, 80 F.4th at 293 (4th Cir. 2023); *see also Middleton* v. *Koushall*, Civil Action No. ELH-20-3536, 2024 WL 1967816, at *30 (D. Md. May 3, 2024).

> b) Warrantless Arrest

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck* v. *Alford*, 543 U.S. 146, 152 (2004). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland* v. *Pringle*, 540 U.S. 366, 371 (2003); *see also Brinegar* v. *United States*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act."). Although probable cause requires less than the standard of evidence needed to convict, it requires more than "bare suspicion." *United States* v. *Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (citations omitted).

To determine whether probable cause exists the Court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Pringle*, 540 U.S. at 371 (internal quotation marks and citation omitted). Probable cause for multiple officers may be established through the "collective knowledge doctrine." *United States* v. *Massenburg*, 654 F.3d

480, 494 (4th Cir. 2011). The "collective-knowledge doctrine simply directs [a court] to substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer." *Id.* at 493; *see also United States* v. *Laughman*, 618 F.2d 1067, 1072 (4th Cir. 1980) ("The law seems to be clear that so long as the officer who orders an arrest or search has knowledge of facts establishing probable cause, it is not necessary for the officers actually making the arrest or conducting the search to be personally aware of those facts.").

Here, the lawfulness of Defendants' warrantless arrest of Mr. Boeh's turns on whether there was probable cause to believe Mr. Boeh had committed an offense. Mr. Boeh contends that after Officer Gephardt opened the front door to the upper-level apartment without consent, he "verbally proclaim[ed] his right to be in the apartment and attempt[ed] to close the door." ECF No. 45-1 at 24. Defendants argue that probable cause existed to arrest Mr. Boeh for assault because "Plaintiff quickly advanced to the door and tried to shut it on Officer Gephardt's body" in what Officer Gephardt perceived as an "aggressive manner." ECF No. 52-1 at 9, 18. Defendants further argue that "it was objectively reasonable for Officer Gephardt to conclude that Plaintiff had assaulted him." *Id.* at 19. Whether Mr. Boeh did so and, thus whether there was probable cause to arrest Mr. Boeh, is one of the precise disputed issues in this case, which precludes entry of summary judgment on Mr. Boeh's warrantless arrest Section 1983 claim. *Hayes* v. *City of Seat Pleasant, Md.*, 469 Fed. Appx. 169, 175 (4th Cir. 2012) (summary judgment inappropriate due to disputed facts on central issues, including the existence of probable cause); *Lehan* v. *Wilson*, Civil Action No. BAH-21-362, 2025 WL 1261168, at *7 (D. Md. Apr. 30, 2025) (denying summary judgment due to material issues of disputed fact regarding the existence of probable cause for an arrest) (collecting cases); *Allotey* v. *Baltimore Cnty., Md.*, Civil Action No. JMC-21-2288, 2022 WL 17105120, at *7–8 (D. Md. Nov. 22, 2022) (same).

A reasonable factfinder could find that Mr. Boeh merely attempted to close the door to his home after Officer Gephardt had opened it without his consent.  If so, Officer Gephardt did not have probable cause to arrest Mr. Boeh and his entry into the upper-level apartment and subsequent seizure of Mr. Boeh violated the Fourth Amendment.  A reasonable factfinder, however, could also credit Officer Gephardt's account and conclude that he did, in fact, have legal justification to arrest Mr. Boeh because he was behaving aggressively and assaulted Gephardt when he closed the door on his leg.  Determining whether Officer Gephardt acted reasonably in believing there was probable cause to arrest Mr. Boeh requires the Court to assess the credibility of the witnesses and weigh evidence, tasks that are reserved exclusively for the factfinder.  *Machie*, 2013 WL 3353740, at *11 ("Here, there is a significant factual dispute, and it is the role of the jury to determine what exactly happened during [Plaintiff's] arrest."); *Pritchett* v. *Alford*, 973 F.2d 307, 313 (4th Cir. 1992) ("If there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial.").

Whether Officer Dail entered Mr. Boeh's apartment is also a material question of disputed fact.  The video is unclear, and the parties offer differing accounts of what occurred.  If the factfinder were to conclude that Officer Dail entered the apartment, then under the collective knowledge doctrine, any probable cause that may (or may not) be found to exist would be imputed to Officer Dail and therefore provide legal justification for his alleged entry into the apartment.  *Laughman*, 618 F.2d at 1072-1073.  These, too, however, are determinations for the factfinder, not for the Court on summary judgment.

Defendants also contend that they are they are qualifiedly immune from suit on Mr. Boeh's warrantless arrest Section 1983 claim.  ECF No. 52-1 at 22–24.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). This immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* At summary judgment, the availability of qualified immunity turns on (1) whether a plaintiff has established a violation of a constitutional right and (2) whether that right was "clearly established" at the time of the alleged violation. *Id.* at 232.

"To determine whether a right is clearly established, [the Court must] assess whether the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." *Wilson* v. *Prince George's Cnty., Md.*, 893 F.3d 213, 221 (4th Cir. 2018) (internal quotation marks and citation omitted). "A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Id.* Courts, however, are "not to define clearly established law at a high level of generality," and "[s]pecificity is especially important in the Fourth Amendment context." *Kisela* v. *Hughes*, 584 U.S. 100, 104 (2018) (internal quotation marks and citations omitted). "Defining the right at a high level of generality 'avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or she faced.'" *Atkinson* v. *Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024) (alteration in original) (quoting *District of Columbia* v. *Wesby*, 583 U.S. 48, 63-64 (2018)). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle* v. *Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citation omitted).

The contested material facts salient to Mr. Boeh's warrantless arrest render a decision on qualified immunity unavailable. *Buonocore* v. *Harris*, 65 F.3d 347, 359-360 (4th Cir. 1995)

("[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants."); *see also Vathekan,* 154 F.3d at 179-180 (declining to decide whether a law enforcement officer was entitled to qualified immunity because "[w]hen resolution of a case depends on determining what actually happened, the issue is inappropriate for resolution by summary judgment.") (internal quotations omitted); *Cooper* v. *Doyle*, Civil Action No. DKC 22-52, 2024 WL 3568564, at *14 (D. Md. July 29, 2024) (collecting cases). Summary judgment is therefore denied as to all parties on Mr. Boeh's warrantless arrest Section 1983 claim.

c)      Use of Force

Claims that a law enforcement officer used excessive force during an arrest are analyzed under the Fourth Amendment. *Graham*, 490 U.S. at 395. The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City* v. *Stuart*, 547 U.S. 398, 403 (2006). That inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances." *County of Los Angeles* v. *Mendez*, 581 U.S. 420, 427-428, (2017); *Tennessee* v. *Garner*, 471 U.S. 1, 9 (1985). The reasonableness of the Defendants' use of force in arresting Mr. Boeh requires the Court to "consider the facts at the moment that the challenged force was employed," *Smith* v. *Ray*, 781 F.3d 95, 101 (4th Cir. 2015), "with an eye toward the proportionality of the force in light of all the circumstances," *Rowland* v. *Perry*, 41 F.3d 167, 173 (4th Cir. 1994). Here, disputed issues of material fact impede any such analysis. *Machie*, 2013 WL 3353740, at *11; *see also Joaquim* v. *Buzzuro*, Civil Action No. CDA-22-50, 2024 WL 3936925, at *7 (D. Md. Aug. 26, 2024) ("Although a jury may find one version of the events is more persuasive than the other, the Court cannot and will not make such credibility determinations at this stage.").

25

The factual dispute also renders summary judgment on qualified immunity grounds regarding Defendants' use of force unavailable. *Ackerman* v. *Town of La Plata, Md.*, Civil Action No. DKC-04-113, 2005 WL 8174718, at *6 (D. Md. July 27, 2005) (denying summary judgment on qualified immunity grounds because "whether Plaintiff posed an immediate safety threat to Defendant or whether she was actively attempting to resist arrest at the time of the incident is the center of a factual dispute between the competing versions of the parties"); *see also Joaquim*, 2024 WL 3936925, at *7 ("The question of qualified immunity depends on the resolution of material disputes as to whether Officer Rodden used excessive force and acted reasonably appertaining to the incident in question."). Summary judgment is therefore denied as to all parties on Mr. Boeh's unreasonable force Section 1983 claim.

### C.    Articles 24 and 26 of the Maryland Declaration of Rights (Count Six)

Article 24 of the Maryland Declaration of Rights contains the State of Maryland's constitutional guarantee of due process and equal protection of the law. *E.g.*, *Town of Easton* v. *Public Serv. Comm'n*, 838 A.2d 1225, 1237 n.11 (Md. 2003). "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins* v. *Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013), *aff'd sub nom.*, 558 Fed. Appx. 327 (4th Cir. 2014). For the reasons set forth previously with regard to Mr. Boeh's Fourteenth Amendment claims, *see* II.B.1., *supra*, summary judgment will be granted in favor of Defendants on Mr. Boeh's Article 24 claim.

Article 26 is the Maryland analogue to the Fourth Amendment. *E.g.*, *Neal*, 2025 WL 608191, at *12. Accordingly, "the disposition of Plaintiff's § 1983 claim under the Fourth Amendment 'dictates the same result on [his] Article 26 claim.'" *Dent,* 745 F. Supp. 2d at 661-662 (quoting *Mazuz* v. *Maryland*, 442 F.3d 217, 231 (4th Cir.2006)). For the reasons set forth

previously, *see* II.B.2., *supra*, the parties' motions for partial summary judgment on Mr. Boeh's

Article 26 claim will be granted in part and denied in part.

### D.    Common Law Tort Claims

#### 1.    Trespass (Count One)

Under Maryland law, "trespass is a tort involving 'an intentional or negligent intrusion

upon or to the possessory interest in property of another.'"  *Mitchell* v. *Baltimore Sun Co.*, 164

Md. App. 497, 508 (2005) (quoting *Ford v. Baltimore City Sheriff's Office,* 149 Md. App. 107,

129 (2002)).  "Simply stated a trespass is: 1) a physical act or force against an individual's

property; 2) executed without the property owner's consent; which interferes with a possessory

interest in that property."  *Ford*, 149 Md. App. at 129.  "Because the interference must be

without the plaintiff's consent, consent, either expressed or implied, constitutes a complete

defense, so long as the scope of that consent is not exceeded."  *Mitchell*, 164 Md. App. at 508.

"Traditionally, courts held that although a personal entry is unnecessary for trespass to take

place, a defendant's act must cause an invasion of the plaintiff's property by some tangible

matter."  *Schuman* v. *Greenbelt Homes, Inc.*, 212 Md. App. 451, 475 (2013) (internal quotation

marks and citation omitted).  Thus, Maryland courts have held that "intangible intrusions like

smoke, odor, light and noise are not typically actionable under a trespass theory."  *Id.*

Mr. Boeh argues that Officers Gephardt and Dail trespassed into Mr. Boeh's upper-level

apartment when they entered the property without lawful authority in violation of the Fourth

Amendment.  ECF No. 45-1 at 27–28.  Although the Court has found that Officer Gephardt

violated the Fourth Amendment when he opened the front door to the upper-level apartment, *see*

II.B.2.a, *supra*, it is unclear whether that act is sufficient to establish a trespass under Maryland

law.  Mr. Boeh does not contend that it does, and case law suggests that an actual entry or other

tangible intrusion into the property is required.  *Rosenblatt* v. *Exxon Co., U.S.A.*, 335 Md. 58, 78

(1994) ("When a defendant interferes with a plaintiff's interest in the exclusive possession of the land *by entering or causing something to enter the land*, a trespass occurs.") (emphasis added); *see also State* v. *Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 469 (D. Md. 2019) (collecting cases). As set forth previously, *see* II.B.2.c., *supra*, disputed issues of material fact preclude a determination of whether probable cause to arrest Mr. Boeh existed and whether Officer Dail entered the upper-level apartment.  These same disputed facts preclude entry of summary judgment on the trespass claim as to Mr. Boeh.  Summary judgment will be entered in favor of Officer Abaku on Mr. Boeh's trespass claim for the reasons stated previously with respect to the warrantless entry/unlawful search facet of Mr. Boeh's Section 1983 Fourth Amendment Claim against Officer Abaku.  *See*, II.B.2.a., *supra.*

### 2.    Battery and False Imprisonment (Counts Two and Three)

Under Maryland law, a "battery occurs when one intends a harmful or offensive contact with another without that person's consent."  *Nelson* v. *Carroll*, 355 Md. 593, 600 (1999).  False imprisonment is the deprivation of the liberty of another without consent and without legal justification.  *Great Atl. & Pac. Tea Co.* v. *Paul,* 256 Md. 643, 654 (1970).  An arrest "constitute[s] a deprivation of [ ] liberty."  *Ross* v. *Early*, 899 F. Supp. 2d 415, 430 (D. Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014) (citing *State* v. *Dett*, 391 Md. 81, 94 (2006)).  "False imprisonment . . . and battery (when the force used is not excessive) can only occur when there is no legal authority or justification for the arresting officer's actions."  *Williams* v. *Prince George's Cnty.*, 112 Md. App. 526, 554 (1996).  Accordingly, "[t]he use of *reasonable* force to effectuate an arrest defeats a battery or an assault claim."  *French* v. *Hines*, 182 Md. App. 201, 265 (2008) (emphasis in original) (quoting 6A C.J.S. Assault § 35); *see also Stutzman* v. *Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (collecting Maryland cases).  "However, if during a valid arrest 'an officer uses excessive force, or force greater than is reasonably necessary under

the circumstances, the officer may be liable' for battery." *Id.* (quoting *French*, 182 Md. App. at 265).  Similarly, "a plaintiff cannot establish the 'without legal justification' element [of a false imprisonment claim] if the officer had probable cause to believe that the plaintiff was committing [an offense] in the officer's presence at the time of the arrest." *Meyler* v. *Mayor & City Council of Ocean City*, 736 F. Supp. 3d 272, 294 (D. Md. 2024).  Thus, as noted previously, Mr. Boeh's state law tort claims of battery and false imprisonment "rise and fall" with his Fourth Amendment warrantless arrest and unreasonable force claims.  *See*, II.B., *supra*; *see also Brooks*, 2025 WL 1018882, at *5; *Middleton*, 2024 WL 1967816, at *38-39.  For the reasons set forth previously, *see* II.B.2.b.-c., *supra*, material issues of disputed fact preclude entry of summary judgment on Mr. Boeh's battery and false imprisonment claims.

## III.    CONCLUSION

For the foregoing reasons, Mr. Boeh's motion for partial summary judgment (ECF No. 45) is granted in part and denied in part.  Officers Gephardt, Dail, and Abaku's cross-motion for partial summary judgment (ECF No. 52) is granted in part and denied in part.  A separate Order follows.

Date: September 12, 2025                          _____/s/_____
                                                 Erin Aslan
                                                 United States Magistrate Judge